(No. 47187 )

FRANK GATTO, Individually and as Adm'r, *et al.*, Appellees, v. WALGREEN DRUG COMPANY *et al.*—(Calumet Flexicore Corporation, Third-Party Defendant, Appellant.)

*Opinion filed Sept. 26, 1975.—Rehearing denied Nov. 21, 1975.*

A. R. Peterson, Thomas K. Peterson and William W. Jones, all of Chicago (Peterson, Ross, Rall, Barber & Seidel, of counsel), for appellant.

Moriarty, Rose & Hultquist, Ltd., of Chicago (Maurice James Moriarty and Robert C. Hultquist, of counsel), for appellees.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

Sophie Gatto was injured on June 19, 1964, when the roof of a Walgreen Drug Store in Cook County collapsed.

She sued for personal injuries and her husband, Frank Gatto, sued for loss of consortium. A number of parties were joined as defendants, including the owners of the beneficial interest in the land trust which held title to the property [Lessors] and Louis Sladky, the lessee of the drug store. By their third amended complaint the plaintiffs attempted to join Calumet Flexicore Corporation [Calumet], the company which had installed the roof, as a defendant, but the statute of limitations had run. The Lessors, however, brought in Calumet as a third-party defendant. The jury returned a verdict in favor of Sophie Gatto for $100,000 and Frank Gatto for $20,000, against the Lessors. In addition, the jury returned a verdict of $120,000 in favor of the Lessors and against Calumet.

Calumet appealed from the judgment against it; on January 27, 1970, during the pendency of the appeal, the Lessors assigned their judgment against Calumet to the plaintiffs, Frank and Sophie Gatto. By the terms of the assignment the judgment for $120,000 against Calumet was assigned to the Gattos, and in exchange the Gattos promised that if the judgments were affirmed on review, they would pay $60,000 to the Lessors. At that time there was a substitution of attorneys, and the Lessors were represented on appeal by the same attorneys who represented the plaintiffs. The appellate court affirmed the judgments in an opinion filed on June 26, 1972. *Gatto v. Curtis,* 6 Ill. App. 3d 714.

In July, 1972, Calumet moved in the appellate court to reduce the third-party judgment against it to $60,000. The motion was supported by an affidavit which stated that Calumet's attorney had learned, through a telephone conversation with one of the attorneys for the plaintiffs and Lessors on July 6, 1972, that the judgment in favor of the plaintiffs and against the Lessors had been satisfied for $60,000, so that the liability of Calumet as an indemnitor should have been limited to that amount. The attorneys for the plaintiffs and Lessors filed a response to the

motion that included an affidavit which stated that the assignment of the judgment contained the full and complete agreement between the plaintiffs and the Lessors. Calumet's motion was denied without prejudice, with the suggestion that the question be raised in the trial court.

Thereafter, Calumet filed petitions in the trial court which sought a stay of execution, reduction of the judgment and discovery as to whether there had been a settlement agreement other than the assignment of the judgment. These petitions are described more fully in the appellate court opinion (23 Ill. App. 3d 628, 631). On February 15, 1973, the trial court ruled that discovery would be permitted. On February 22, the attorneys for the plaintiffs and Lessors disclosed, for the first time, an executed settlement agreement dated August 1, 1969. The trial had commenced on Monday, July 28, 1969, and it had continued for two weeks after the settlement agreement, through Wednesday, August 13. The agreement, a five-page handwritten document, provided in part:

"AGREEMENT NOT TO EXECUTE
Dated August 1, 1969

For and in consideration of the payment of the sum of Eighty Thousand ($80,000.00) Dollars, the receipt of which is hereby acknowledged, the undersigned, Frank Gatto and Sophie Gatto, his wife, individually and as husband and wife, paid by and on behalf of [Lessors], *** do hereby covenant and agree not to execute on any judgment rendered in the cause now on trial *** or in any other cause now on file or hereafter filed, arising out of the occurrence of June 19th, 1964, at or near 6865 West 111th Street, Worth, Illinois, in any amount in excess of Eighty Thousand ($80,000.00) Dollars, against the above named defendants.

Further, for and in consideration of the payment of the sum of Fifteen Thousand ($15,000.00) Dollars, the receipt of which is hereby acknowledged, the undersigned, Frank Gatto and Sophie Gatto, his wife, individually and as husband and wife, paid by and on behalf of [lessee], *** do hereby covenant and agree not to execute on any judgment rendered in the cause now on trial *** or in any other cause now on file or hereafter

filed, arising out of the occurrence of June 19th, 1964, at or near 6865 West 111th Street, Worth, Illinois, in any amount in excess of Fifteen Thousand ($15,000.00) Dollars, against the above named defendant.

The above payments, and each of them, are made solely as a purchase of peace and are not to be construed as an admission of liability on the part of any of the said defendants.

Inasmuch as each of the above named defendants has now pending in the above-captioned lawsuit actions in the nature of Third-Party Actions and Counterclaims against certain other parties in the said lawsuit; now therefore it is agreed as follows:

1. In the event that the above named defendants, [Lessors], *** shall in any such Third-Party Action or Counterclaim recover a judgment or judgments, and collect same, in excess of Eighty Thousand ($80,000.00) Dollars, or less than Eighty Thousand ($80,000.00), the distribution thereof shall be as follows: (A) any amount up to an [sic] including Eighty Thousand ($80,000.00) Dollars shall become and remain the sole property of [Lessors] *** or the entity having actually paid the aforesaid Eighty Thousand ($80,000.00) Dollars. (B) Any amount in excess of Eighty Thousand ($80,000.00) shall be paid over to the aforesaid plaintiffs.

2. In the event that the above-named defendant, Louis F. Sladky, shall in any such Third-Party Action or Counterclaim recover a judgment or judgments, and collect same, in excess of Fifteen Thousand ($15,000.00) Dollars or less than Fifteen Thousand ($15,000.00) Dollars, the distribution thereof shall be as follows: (A) Any amount up to and including Fifteen Thousand ($15,000.00) Dollars shall become and remain the sole property of Louis F. Sladky, or the entity having actually paid the aforesaid Fifteen Thousand ($15,000.00) Dollars. (B) Any amount in excess of Fifteen Thousand ($15,000.00) Dollars shall be paid over to the aforesaid plaintiffs.

In the event the aforesaid defendants shall be awarded any judgment or judgments in any such Third-Party Action or Counterclaim, said defendants, at their sole option, may:

1. Attempt to collect such judgment or judgments, or

2. Permit plaintiffs, at plaintiffs' expenses, to attempt to collect such judgment or judgments."

After the disclosure of this agreement, Calumet filed a second amended petition on April 13, 1973. This petition alleged that after the agreement was signed there was no longer a "justiciable cause of action to submit to trial, verdict, and judgment. Hence, the trial was a sham and a charade and the resulting verdicts and judgments are void." It alleged further that the plaintiffs and Lessors fraudulently concealed the agreement from Calumet in an attempt to recover judgments not based on lawful claims. The petition sought an order vacating the judgments against the Lessors and Calumet, an order dismissing plaintiffs' complaints against the Lessors and Calumet, discovery to allow the court to impose appropriate sanctions against persons who participated in the scheme to defraud Calumet, an order assessing damages including attorney's fees, and any other relief that justice required.

On the basis of briefs, affidavits, and oral argument, the trial court, on June 1, 1973, entered an order denying all the relief sought in Calumet's second amended petition. This order, however, continued the stay of execution, granted leave to Calumet to file a motion to limit the amount for which plaintiffs could execute, and continued the cause for further order. The motion to limit execution was filed by Calumet on June 15. It was denied on August 21, 1973. Calumet filed a notice of appeal on September 13 praying for a reversal of both the June 1 and August 21 orders.

The appellate court held that it had no jurisdiction to consider the June 1 order, on the ground that the notice of appeal had not been filed within 30 days from the entry of that order. The appellate court, however, held that it had jurisdiction to limit execution upon the judgment, and limited execution against Calumet to $80,000. In addition, the court held that interest on the $80,000 would accrue only from the date on which the "Agreement Not to

Execute" was disclosed. (23 Ill. App. 3d at 645.) We granted leave to appeal.

On this appeal, Calumet argues that both the June 1 and August 21 orders were reviewable and that the trial court improperly denied the second amended petition. The plaintiffs and Lessors have cross-appealed arguing that the appellate court erred in limiting execution on the judgment and in accruing interest only from the date of the disclosure of the "Agreement Not to Execute."

The first question to be considered is the correctness of the appellate court's determination that it was without jurisdiction to review the trial court's order of June 1, 1973. In reaching that conclusion the appellate court relied upon Rule 304(b)(3) of the rules of this court. Rule 304(a) provides that if multiple claims are involved in an action, an appeal may be taken from a final judgment disposing of less than all of them only if there is an express written finding by the trial judge that there is no just reason for delaying appeal. Rule 304(b) states: "(b) The following judgments and orders are appealable without the finding required for appeals under paragraph (a) of this rule: *** (3) A judgment or order granting or denying any of the relief prayed in a petition under section 72 of the Civil Practice Act." Ill. Rev. Stat. 1973, ch. 110A, par. 304.

The appellate court read this provision as intended to make immediately and separately appealable every order that disposes of any portion of the total relief sought under a section 72 petition. The history of the provision demonstrates that that was not its purpose. The Committee Comments on this rule state that subparagraph (3) is derived from paragraph (6) of section 72 of the Civil Practice Act. (Ill. Rev. Stat. 1967, ch. 110, par. 72(6).) Paragraph (6) was added to section 72 of the Civil Practice Act by the amendments of 1955. It provided: "(6) Any order entered denying or granting any of the relief prayed in the petition is appealable." The Committee Comment

was as follows: "Subsection (6). In order to set at rest doubts as to the right of appeal from post-judgment orders, subsection (6) specifically provides that any order, whether denying or granting the relief sought, shall be appealable." (S.H.A. ch. 110, sec. 72, at 287.) And the Historical and Practice Notes to subsection (6) make it clear that the purpose of the provision was to negate decisions that had required the entry of a formal judgment as a prerequisite to appeal, and to allow an appeal from an order denying a section 72 motion. S.H.A. ch. 110, sec. 72, at 291.

In addition to its reliance on Rule 304(b)(3) to justify its denial of jurisdiction, the appellate court said:

"*** The notice of appeal filed September 13, 1973, was impotent to vest jurisdiction in this court for review of the order of June 1, 1973. In this regard, the situation presented here by the filing of one notice of appeal directed to two separate orders is analogous to the situation in *Weber v. Northern Illinois Gas Co.,* 10 Ill. App. 3d 625, 295 N.E.2d 41, in which this court dismissed an attempted appeal involving one count of a complaint and proceeded with the appeal involving the other count." 23 Ill. App. 3d at 637-38.

The appellate court's reliance on *Weber v. Northern Illinois Gas Co.* is hard to understand, for in that case there was an express finding by the trial judge that there was no just reason for delaying appeal. In the present case, however, it was the stated intent of the trial judge that there should be but one appeal. After he had indicated that he would consider a motion to limit execution, it was suggested that such a motion should be made in the supplementary proceedings when the Gattos were executing on their judgment. The judge rejected this suggestion, stating:

"*** if this thing is going to be appealed and you say

that, fine. I really don't care. That is not my concern at all. But whatever is going to be done, it is going to be done in one package and going to the Appellate Court, and they are going to make all the determinations necessary."

As has been mentioned, the order of June 1 continued the stay of execution, granted Calumet leave to file a motion to limit execution and *continued the cause for further order.* We believe that the judge's statement, coupled with the terms of his order, shows that he intended that the June 1 order would become appealable only when the entire cause was disposed of. We hold, therefore, that the appellate court did not lack jurisdiction to review the order of June 1.

The question then arises as to whether or not it is necessary to remand the cause to the appellate court for that review. We have concluded that it is not. Rule 366 provides:

"In all appeals the reviewing court may, in its discretion, and on such terms as it deems just: ***

(5) give any judgment and make any order that ought to have been given or made, and make any other and further orders and grant any relief, including a remandment, a partial reversal, the order of a partial new trial, the entry of a remittitur, or the issuance of execution that the case may require." (Ill. Rev. Stat. 1973, ch. 110(A), par. 366.)

In many instances this court, acting under Rule 366, has decided issues that had not been presented to or decided by the court whose decision is being reviewed. See, *e.g., Wozniak v. Segal,* 56 Ill.2d 457; *Schatz v. Abbott Laboratories,* 51 Ill.2d 143; *Doran v. Cullerton,* 51 Ill.2d 553; *Wadlington v. Mindes,* 45 Ill.2d 447, 453; *Hux v. Raben,* 38 Ill.2d 223.

Although the appellate court held that it was without jurisdiction to review the order of June 1, 1973, in its opinion it found all of the facts necessary for a review of that order, and applied its finding when it restricted execution upon the judgment of $120,000 to the sum of

$80,000. In its opinion the court stated:

"*** The important and decisive element is that it is clear and certain that this agreement was not disclosed to any of the courts involved in this proceeding until February 22, 1973, virtually 3 years and six months after its execution. The agreement was not disclosed to the trial judge who presided over the original jury trial, to this court on the first appeal, to the Supreme Court in connection with the petition for leave to appeal and in other matters brought before it, or to any of three trial judges who heard some portions of the subsequent proceedings. The only portion of the transaction between these parties ever disclosed to any court until February 22, 1973, was the assignment of judgment which was entered into on January 27, 1971." 23 Ill. App. 3d at 641.

Concerning the knowledge of Calumet's attorney as to the settlement, the appellate court found from the affidavits "that there is a possibility that counsel for Calumet was generally aware of the existence of some arrangement between attorneys for plaintiffs and for the Lessors." (23 Ill. App. 3d at 641.) But later, in concluding that interest on the sum of $80,000 did not commence to run until February 22, 1973, the date upon which the amount of the settlement was disclosed, the appellate court said:

"*** If we were to hold that interest commenced to run on the sum of $80,000 from the date of entry of the judgment, we would be rewarding concealment of the agreement from the court and encouraging such tactics for the future and we would simultaneously be penalizing Calumet unjustly for its failure to tender payment when the amount due was actually unknown." (23 Ill. App. 3d at 645.)

The trial court appears to have taken the position that fraudulent concealment had not been shown on the ground that the attorneys for Calumet "made no official inquiry" into whether or not the plaintiffs' claim against the lessors had been settled. This position was erroneous. The burden rested upon the persons who had entered into the settlement to disclose it. It was not the responsibility of Calumet or of the trial judge to ferret out the facts. It has long been held that "a suppression of the truth may amount to a suggestion of falsehood; and if, with intent to deceive, either party to a contract of sale conceals or suppresses a material fact, which he is in good faith bound to disclose, this is evidence of and equivalent to a false representation, because the concealment or suppression is in effect a representation that what is disclosed is the whole truth. The gist of the action is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant, or his concealment or suppression of material facts not equally within the knowledge or reach of the plaintiff." *Stewart v. Wyoming Cattle Ranche Co.* (1888), 128 U.S. 383, 388, 32 L. Ed. 439, 441; see also *People ex rel. Chicago Bar Association v. Gilmore* (1931), 345 Ill. 28, 46; *Ellman v. De Ruiter* (1952), 412 Ill. 285.

If the agreement was to be successful, it was imperative that it be concealed. It provided that the Lessors would pay $80,000 to the plaintiffs as a "purchase of peace." After that agreement was entered into, there was no longer any controversy whatsoever remaining to be decided between those two parties. After the agreement was entered into, the Lessors no longer had a claim for third-party indemnification against Calumet in any amount in excess of $80,000, and the plaintiffs, as has been stated, had no right of action whatsoever against Calumet. Disclosure would have frustrated the scheme. While our constitution provides that "Circuit Courts shall have

original jurisdiction of all justiciable matters" (Ill. Const. 1970, art. VI, sec. 9), it does not confer jurisdiction to decide sham controversies. No "justiciable matter" exists where two former adversary parties have settled their differences as to all the issues they are purportedly litigating before the trial court. See generally *Moore v. Charlotte-Mecklenburg Board of Education* (1971), 402 U.S. 47, 28 L. Ed. 2d 590, 91 S. Ct. 1292; *Sturgeon v. Powell* (1969), 118 Ill. App. 2d 382; Wright, Law of Federal Courts, sec. 12 (1970).

The trial court relied on our opinion in *Reese v. Chicago, Burlington & Quincey R.R. Co.* (1973), 55 Ill.2d 356, but we agree with the appellate court that there are crucial differences between the two cases. In *Reese,* both defendants could have been found directly liable to the plaintiff, while in the present case, Calumet was not liable directly to the plaintiffs. In *Reese,* the railroad company was dismissed from the action, and the court was not placed in the position of trying a nonexistent controversy. (See generally *Lum v. Stinnett* (1971), 87 Nev. 402, 488 P.2d 347.) And in *Reese,* the remaining defendant knew of the loan receipt agreement during the trial. The majority opinion in *Reese* acknowledged that loan agreements could tend to "undermine the adversary nature and integrity of the proceedings" (55 Ill.2d at 364), but expressed the belief that this danger could be avoided by permitting the remaining defendants to cross-examine witnesses as to any possible bias resulting from the loan agreement and by permitting the defendant to introduce the loan agreement for consideration by the jury. Quite apart from any question as to the effectiveness of these safeguards (see Note, The Mary Carter Agreement—Solving the Problems of Collusive Settlements in Joint Tort Actions, 47 So. Cal. L.R. 1393 (1974)), they cannot be utilized if the loan agreement is kept secret. See *Ward v. Ochoa* (Fla. 1973), 284 So. 2d 385.

For the reasons stated, the judgments of the circuit

524

court of Cook County and of the appellate court are reversed.

*Judgments reversed.*