(Nos. 50314, 50326 cons.—

SANFORD KERNS, Appellee and Appellant, v. GUSTAV ENGELKE *et al.* (Koehring Company, d/b/a Fox River Tractor Company, Appellant and Appellee).

*Opinion filed May 24, 1979.*

Pratt, Pierce, Bradford & Gitchoff, Ltd., of East Alton (John T. Pierce, Jr., of counsel), for Fox River Tractor Company.

Burton C. Bernard and William G. Kaseberg, of Bernard & Davidson, of granite City, for Timmerman Implement Company.

Hoagland, Maucker, Bernard & Almeter, of Alton (James K. Almeter, of counsel), for Sanford Kerns.

MR. JUSTICE CLARK delivered the opinion of the court:

The plaintiff, Sanford Kerns, was severely injured in the course of his work as an employee of Gustav and Leola Engelke, doing business as Engelke Dairy Farms. In the circuit court of Madison County, jury verdicts, awarding the plaintiff $225,000 in damages, were returned against all the defendants: the Engelkes, on the basis of negligence; and Fox River Tractor Co. (the manufacturer of the forage blower involved in the injury) and Melvin Timmer-

man (the retailer doing business as Timmerman Implement Co.) on the basis of strict liability in tort. In a counterclaim, Timmerman received a judgment for indemnity "plus a reasonable sum for legal fees, court costs and other expenses of defense" against Fox River. The appellate court affirmed. However, it remanded for a precise determination of the amount owed Timmerman, and found a "loan receipt agreement," entered into between the plaintiff and the Engelkes subsequent to the trial court judgment, void. (54 Ill. App. 3d 323.) We allowed (65 Ill. 2d R. 315) and consolidated the separate appeals of the plaintiff and Fox River.

The plaintiff lost an eye when struck by a wire, apparently used to hold temporarily in place the power takeoff assembly of a "long-hopper" forage blower while the blower was being moved. The forage blower is used to convey, by means of blowing up a long, tubular pipe, silage into a silo. The blower here, owned by the Engelkes, sold by Timmerman and manufactured by Fox River, consisted of several main parts: a hopper into which the silage is fed, and which carries the silage to the blower and spout; a blower mechanism by means of which the silage is forced up the spout and into the silo or storage bin; the spout; wheels and a tractor hitch for transit; and the power takeoff assembly, an arm-like mechanism which is hooked up to the power takeoff of a tractor and provides the power for the blower. When the forage blower is moved to another location, the power takeoff assembly must be detached from the tractor so the tractor can be connected to the hitching tongue of the blower. The power takeoff assembly is designed in such a way that during movement it must be entirely removed, and placed in the rectangular hopper or carried separately; otherwise it will drag on the ground. Testimony showed that the Engelkes did not remove the power takeoff assembly from the blower but, for convenience, simply tied or wired the unconnected or

tractor end to the blower while the blower was in transit. Each end of the power takeoff assembly is equipped with a "quick disconnect" button for attachment and removal. Testimony also showed that the blower was not equipped with any device to carry or cradle the power takeoff assembly while in transit. Plaintiff's injury occurred as he was helping to connect the power takeoff assembly to the tractor. The wire holding the assembly was loosened or removed. While Charles Engelke, son of the farm owners, backed the tractor up to the assembly for connection, the plaintiff held the assembly off the ground. The wire hit him in the eye while he was holding the power takeoff assembly. There was also testimony that no warning, apropos of danger that might result by failing to remove the power takeoff assembly for purposes of moving the blower, was placed on the blower; and that it was common practice, for convenience, to secure by "tying up" the tractor end of the assembly to the blower during transit.

In its appeal, Fox River first contends that the plaintiff failed to state a cause of action and that the jury was improperly instructed because the plaintiff did not allege that the product *itself* was unreasonably dangerous. Rather, the argument continues, the plaintiff maintained that the forage blower was unreasonably dangerous only because it lacked a device to hold or secure the power takeoff assembly while it was being moved. This necessitates, Fox River concludes, pleading and proving that an "alternative design" was feasible under the state of the art at the time the blower was manufactured, and the plaintiff failed to do so. The parties do not dispute that the plaintiff's injury was due to the product's condition which existed at the time the forage blower left Fox River's control. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 623.) The question before us is whether that condition—lack of a device to hold or secure the power takeoff assembly while the blower was being moved—was

properly determined to be an unreasonably dangerous defect in design. (Defect in design, like defect in manufacture, is a basis for strict liability in tort. (*Wright v. Massey-Harris, Inc.* (1966), 68 Ill. App. 2d 70, 79; 2 J. Dooley, Modern Tort Law 294 (1977) (hereafter Dooley); W. Prosser, Torts 644 (4th ed. 1971). See also *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 420, 431.))

The appellate court rightly points out that, in cases of strict liability, "focus is on the product," not the conduct. (54 Ill. App. 3d 323, 329.) In holding that Fox River's argument and the "state of the art" defense have no place in the instant case, the appellate court relied on *Cunningham v. MacNeal Memorial Hospital* (1970), 47 Ill. 2d 443. We believe that reliance is not quite correct. In *Cunningham,* a patient contracted serum hepatitis from defective blood. This court decided the hospital was liable, even though medical science could not determine the presence of the serum hepatitis virus in the blood, because such a defense would weaken the doctrine of strict liability. The case is distinguishable since there the product itself was unreasonably dangerous. Here the allegation is that the lack of a securing device for the power takeoff assembly made the product not reasonably safe, and that is a factual issue that must be determined by the fact finder. (Our reasoning may not be interpreted as limiting *Cunningham,* nor as "signal[ing] a return to a negligence theory." (47 Ill. 2d 443, 453.)) On the other hand, we do not adopt Fox River's argument. Fox River maintains that our law for cases of defective design is that a plaintiff must plead and prove alternative design and its feasibility, which the plaintiff failed to do here. Fox River cites *Lolie v. Ohio Brass Co.* (7th Cir. 1974), 502 F.2d 741, 744, which held that "the plaintiff must establish that the 'product in question has [not] lived up to the required standard of safety.' [Citations.] This, of course, requires proof that,

*inter alia*: 1) the product as designed is incapable of preventing the injury complained of; 2) there existed an alternative design which would have prevented the injury; and 3) in terms of cost, practicality and technological possibility, the alternative design was feasible. Evidence of post-occurrence change which tended to satisfy plaintiff's burden on any of these issues would, therefore, be relevant." *Lolie* so held on the basis of two cases from our appellate court. In the first case, *Wright v. Massey-Harris, Inc.* (1966), 68 Ill. App. 2d 70, the plaintiff, a farm employee, was injured while manually trying to extract an ear of corn which was jammed in the shucking rollers of a self-propelled corn picker. He alleged that the lack of a shield over the rollers was dangerously defective. While *Wright* was pending in the appellate court, this court decided *Suvada* (32 Ill. 2d 612), so the *Wright* court held:

> "The present case involves a claimed defect in design rather than a defect in manufacture and we interpret Suvada to mean that the strict liability imposed upon a manufacturer includes injuries which arise from defects in design as well as defects in manufacture.
>
> Whether the design defect in the present case is of a nature upon which liability can be imposed involves the factual question of whether it creates an unreasonably dangerous condition, or, in other words, whether the product in question has lived up to the required standard of safety.
>
> We believe that the complaint in the present case states a good cause of action in negligence and also a good cause of action in strict liability if we treat all of the allegations in excess of those required by Suvada as surplusage." (68 Ill. App. 2d 70, 79.)

*Wright* demonstrates that the plaintiff must present pertinent evidence, such as an alternative design which is

economical, practical and effective, to the fact finder, who determines whether the complained-of condition was an unreasonably dangerous defect. This, we believe, is what *Sutkowski v. Universal Marion Corp* (1972), 5 Ill. App. 3d 313, 319, also stands for:

> "In the development of product's liability principles design alternatives are appropriately considered whether reasonable care is the basis of liability or where liability is predicated upon strict tort liability. [Citation.] In both cases it appears that policy considerations are involved which shift the emphasis from the defendant manfacturer's conduct to the character of the product. Such change in emphasis furnishes additional reasons for permitting evidence of alternative designs in a strict tort liability case.
>
> The possible existence of alternative designs introduces the feature of feasibility since a manufacturer's product can hardly be faulted if safer alternatives are not feasible. In this connection feasibility includes not only the elements of economy, effectiveness and practicality but also the technological possibilities viewed in the present state of the art. If the feasibility of alternative designs may be shown by the opinions of experts or by the existence of safety devices on other products or in the design thereof we conclude that evidence of a post occurrence change is equally relevant and material in determining that a design alternative is feasible."

Neither *Lolie, Wright* nor *Sutkowski* holds that a plaintiff *must plead* alternative design, as Fox River argues. Whether *Lolie,* which holds that a plaintiff *must prove* alternative design, correctly states our law is a question which does not have to be answered here. The plaintiff proved, as he must, to the satisfaction of the fact finder,

the unreasonably dangerous nature of the defect in design; and here he did so by presenting pertinent evidence such as feasible alternative design. See *Anderson v. Hyster Co.* (1979), 74 Ill. 2d 364, 368.

The plaintiff's pleading and proof, and the court's instruction here, were sufficient for the jury to find for the plaintiff. His complaint alleged "faulty engineering design for the disconnection" mechanism of the power takeoff assembly, and an amendment to his first amended complaint alleged the forage blower "was not equipped with any type of mechanism to hold the power take-off shaft off the ground when the machine was being moved." The complaint sufficiently alleged a cause of action on the basis of defective design. Evidence, in the form of testimony by Dr. Norval Wardle, an agricultural safety engineer who is retired from Iowa State University and does full-time consulting work, supports the view that economical, practical and effective alternate designs for holding or securing the power takeoff assembly were feasible at the time the forage blower was purchased. He described several simple, possible devices. A review of the record—that is, of the evidence of alternate designs and of the given instructions—supports the circuit court's judgment that the lack of a securing device for the power takeoff assembly was not reasonably safe. Finally, we find that Fox River's instruction, given over the plaintiff's objection, correctly apprised the jury of the law:

> "There is no duty upon the manufacturer of the forage blower to manufacture the product with a different design, if the different design is not feasible. Feasibility includes not only elements of economy, effectiveness and practicality, but also technological possibilities under the state of the manufacturing art at the time the product was produced."

Before we can definitively say the jury correctly determined Fox River's liability for defective design, we believe one other consideration, in tandem with that issue,

is necessary. That consideration is whether the use of something extraneous (the wire to secure the power takeoff assembly), which causes the injury but is not a part of either the product or its design, is a reasonably foreseeable misuse. (See *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 425; *Lewis v. Stran Steel Corp.* (1974), 57 Ill. 2d 94, 102; *Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.* (1975), 62 Ill. 2d 77, 81, 83-84.) This is a question of fact (*Winnett v. Winnett* (1974), 57 Ill. 2d 7, 13) which is measured by an objective standard (*Anderson v. Hyster Co.* (1979), 74 Ill. 2d 364, 369). If the use of a product "is abnormal, but nonetheless one that may be anticipated, it may be foreseeable." (2 Dooley 360.) There "is a distinction between the intended use and the foreseeable use, and *** where a particular use should be known to the reasonably prudent manufacturer such use cannot be labelled unforeseeable." (*Dunham v. Vaughan & Bushnell Mfg. Co.* (1967), 86 Ill. App. 2d 315, 328, *aff'd* (1969), 42 Ill. 2d 339.) We believe that law is closely akin to the facts in this case, and that foreseeability may be reasonably attributed to the manufacturer here. The power takeoff assembly of the blower weighs about 60 pounds and is designed to fit rather snugly onto both the blower and tractor. To connect or disconnect one end of the assembly, or to remove it entirely, requires some effort. Dr. Wardle testified the "most usual way I have seen" the assembly "handle[d]" is by tying it "up in some manner with a cord, string, rope, wire, what have you *** as securely as they can do to the machine and then they can move it." Timmerman, the defendant retailer, confirmed this by stating that local custom for solving the "dangling" assembly while moving the long-hopper blower involved three alternative methods: removing the assembly entirely, removing half of it by taking it apart, or tying the loose end of the assembly to the blower. "[T]he simplest way in most cases," he testified, "is by wiring it up."

Timmerman further conceded that he "wired it up" when he had to move the blower, and that some "short-hopper" blowers were equipped with a "cradle device" to hold the assembly. Fox River's expert denied that "tying" or "wiring up" the assembly of a long-hopper blower was customary or foreseeable. We agree with the appellate court that there was sufficient evidence for the jury to conclude the "misuse" was reasonably foreseeable.

Our decision must not be construed as holding that the absence of the "safest" design is unreasonably dangerous as a matter of law. A manufacturer is not required to produce a product which represents the " 'ultimate in safety' " (*Warner v. Kewanee Machinery & Conveyor Co.* (6th Cir. 1969), 411 F.2d 1060, 1066, *cert. denied* (1970), 398 U.S. 906, 26 L. Ed. 2d 65, 90 S. Ct. 1685, see *Day v. Barber-Colman Co.* (1956), 10 Ill. App. 2d 494, 508.) Rather, we premise liability on our finding that not only does the evidence support the jury's conclusion that a safer, economical and feasible design existed, but it also supports the conclusion that safe use of Fox River's design was impractical, resulting in a foreseeable misuse. *Anderson v. Hyster Co.* (1979), 74 Ill. 2d 364, 369.

Fox River's second contention is that the courts below erred in giving attorney's fees to Timmerman, the retailer. Timmerman successfully counterclaimed for indemnification against Fox River. Fox River does not raise any question regarding that judgment except for the litigation expenses which the appellate court affirmed (but remanded for an accurate determination of them). The law in Illinois clearly is that absent a statute or a contractual agreement "attorney fees and the ordinary expenses and burdens of litigation are not allowable to the successful party." (*Ritter v. Ritter* (1943), 381 Ill. 549, 553. Accord, *Meyer v. Marshall* (1976), 62 Ill. 2d 435, 442; *House of Vision, Inc. v. Hiyane* (1969), 42 Ill. 2d 45, 51-52.) The appellate court distinguished the instant case from *Ritter*

and the general proposition above in that the attorney's fees here were the result of defending a prior action which gave rise to the indemnity claim. Although some authorities agree with the Appellate Court for the Fifth District (*e.g.,* D. Dobbs, Remedies 196 (1973), and 42 C.J.S. *Indemnity* sec. 24 (1944)), we note that other districts of the Illinois appellate court do not (*Insurance Co. of North America v. J. L. Hubbard Co.* (4th Dist. 1974), 23 Ill. App. 3d 254, 261-63; *Reese v. Chicago, Burlington & Quincy R.R. Co.* (2d Dist. 1972), 5 Ill. App. 3d 450, 457-58, *aff'd* (1973), 55 Ill. 2d 356). We are not persuaded we should create an indemnity exception to the *Ritter* holding even under the circumstances of this case in which Timmerman gave Fox River sufficient notice, and was ostensibly entitled to indemnification. Timmerman was properly sued as a defendant strictly liable; and that Timmerman was successful in the indemnity action is not a distinction sufficient to remove him from the ruling in *Ritter.* Hence, we reverse the appellate court on this issue.

In his appeal, the plaintiff argues that not only was the "Loan Receipt and Agreement" (hereafter loan agreement), entered into after entry of judgment, proper, but the question of its validity was improperly before the appellate court for review. By the agreement, the Engelkes and their insurance company would loan $100,000, interest free, to the plaintiff, who was obligated to repay the sum "from any amounts collected from" Timmerman and Fox River. (Timmerman is not involved in plaintiff's appeal.) The trial court allowed the Engelkes' motion for judgment notwithstanding the verdict. Subsequently, both Timmerman and Fox River filed amendments to their post-trial motions asking the trial court to determine that the $100,000 loan was partial satisfaction or should be considered a setoff. The trial court entered another order, which noted that "the defendants Engelkes have paid to plaintiff $100,000 in return for a so called [*sic*] loan

receipt and plaintiff in turn confesses defendants Engelkes' post-trial motion," and which reiterated judgment notwithstanding the verdict in favor of the Engelkes. The trial court also entered an order denying the post-trial motions of Fox River and Timmerman.

The plaintiff contends that the question of the validity of the loan agreement was improperly before the appellate court. Plaintiff reasons, rather vaguely, that after the judgment Fox River and Timmerman "should have filed an affirmative pleading to which responsive pleadings would have been filed." We find no merit in this contention. Since the loan agreement was made subsequent to the judgment, and the trial court initially ordered judgment notwithstanding the verdict in favor of the Engelkes, ostensibly based on the loan agreement, the defendants properly—perhaps without much choice—raised their objections in the post-trial motions. The trial court, as it "must[,] rule[d] upon all relief sought in all post-trial motions" (Ill. Rev. Stat. 1973, ch. 110, par. 68.1(6)); it denied the motions. The record contains sufficient information for the appellate court to have reviewed the issue of the validity of the loan agreement. (See *Harris v. Algonquin Ready Mix, Inc.* (1974), 59 Ill. 2d 445, 450, where this court reviewed the issue of validity of a loan agreement made after the appellate court reached its decision but before this court granted leave to appeal. See also 58 Ill. 2d R. 366(a)(5), (b)(1), (b)(2)(iii).)

The plaintiff suggests that the appellate court misapprehended the State's public policy by holding the loan agreement in this case void. We do not agree. In *Reese v. Chicago, Burlington & Quincy R.R. Co.* (1973), 55 Ill. 2d 356, 361-63, this court, with three judges dissenting, upheld the validity of a loan agreement which had been executed prior to trial. (Accord, *Luckenbach v. W. J. McCahan Sugar Refining Co.* (1918), 248 U.S. 139, 63 L. Ed. 170, 39 S. Ct. 53. See Annot., 62 A.L.R.3d 1111

(1975); 1 Dooley 559-61.) The *Reese* majority expressed its concern that, despite the bar against contribution or the want of the right of indemnity in a particular case, a loan agreement permitted a joint tortfeasor to accomplish "by indirection" what he was not permitted to do directly. (Since then *Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, has held that contribution among tortfeasors is permissible.) This court felt, however, that loan agreements were appropriate because the savings, due to private settlements which avoided perhaps complex litigation, might be offered to a plaintiff more readily. Moreover, the majority concluded adequate protections existed if the remaining defendants were able to cross-examine witnesses for possible bias, and if the loan agreement could be introduced to the jury for its consideration. *Reese v. Chicago, Burlington & Quincy R.R. Co.* (1973), 55 Ill. 2d 356, 364.

The use of loan agreements is not unlimited, however. In *Gatto v. Walgreen Drug Co.* (1975), 61 Ill. 2d 513, this court found the loan agreement there, entered into during trial but not discovered until the case had been appealed to the appellate court, invalid. *Gatto* held that despite the "safeguards" *Reese* set out, those safeguards "cannot be utilized if the loan agreement is kept secret." (61 Ill. 2d 513, 523.) "After *Gatto* and *Reese* it can now definitely be said that in Illinois if a 'Mary Carter' agreement [*i.e.,* a loan agreement] is entered into between any of the parties to a given lawsuit the agreement must be revealed and it can be used for purposes of impeachment and introduced into evidence for consideration by the jury with an instruction on the limited effect of its admission if requested." (Michael, *"Mary Carter" Agreements in Illinois,* 64 Ill. B.J. 514, 521 (1976) (hereafter Michael).) In *Harris v. Algonquin Ready Mix, Inc.* (1974), 59 Ill. 2d 445, 451-52, this court, as the plaintiff here correctly observes, stated that a loan agreement, entered into

between plaintiff Harris and defendant Commonwealth Edison after the appellate court rendered its decision but before this court granted leave to appeal, did not provide Edison with the standing to challenge a judgment *n.o.v.* in favor of another defendant. (Only Edison petitioned for leave to appeal, although Harris sought to join Edison in its reply brief.) However, that is not all this court stated:

> "Edison has also suggested that the 'loan agreement' affords a basis for its challenge to the judgment *n.o.v.* Edison equates the 'loan agreement' to that approved by a majority of this court in *Reese v. Chicago, Burlington & Quincy R.R. Co.,* 55 Ill. 2d 356. Examination of our opinion in that case clearly shows that the 'loan agreement' was *made prior to trial before liability of the multiple defendants could be adjudicated.* There is no language contained therein which fairly suggests that such a procedure would be approved on appeal to provide a sole basis whereby a defendant, who is alleged to be a joint tortfeasor and against whom liability is determined, might seek consideration of an issue previously decided adversely to the plaintiff in his action against a co-defendant. *Acquiescence to Edison's position under such circumstances would be tantamount to this court's approval of an assignment of a personal injury judgment on appeal to a party who has been found liable for the injury and who does not now even contest this liability."* (Emphasis added.) (*Harris v. Algonquin Ready Mix, Inc.* (1974), 59 Ill. 2d 445, 451-52.)

This suggests, and we make explicit, that the use of loan agreements is proper only where judgment has not been reached. We assume, of course, the agreement was entered into in good faith. Michael, 64 Ill. B.J. 514, 526-28.

The plaintiff also argues that he "had the right to enforce the judgments as against any of the joint tort-feasors to his liking." This is true, but it is not an unrestricted right. (See *Chmielewski v. Marich* (1954), 2 Ill. 2d 568, 571.) Our comments above, as well as the quoted portion of *Harris* above, demonstrate a justification for such a restriction. (*E.g.*, a defendant should not be able to get around the bar to indemnification, where he may not be entitled to it, because of acquiescence or agreement by a plaintiff. See also the comments of the dissent in *Reese* (55 Ill. 2d 356, 367).) In short, we agree with the analysis of the appellate court: the loan agreement is void here and the money advanced to the plaintiff is a partial satisfaction of plaintiff's judgment.

For the reasons stated, the judgment of the appellate court, except as to the issue of attorney's fees, is affirmed. The judgment of the circuit court is affirmed except as to that part of the judgment awarding Timmerman attorney's fees, court costs, and "other expenses of defense."

*Appellate court affirmed in part and reversed in part; circuit court affirmed in part and reversed in part.*