BRIAN BANOVZ, Plaintiff, v. RAYMOND RANTANEN, Defendant-Appellant (Joseph Seketa, Plaintiff-Appellee; Mickow Corporation *et al.*, Defendants).

Fifth District   No. 5—94—0095

Opinion filed April 26, 1995.

Harry C. Armstrong, Stephen W. Thomson, and Charles C. Compton, all of Reed, Armstrong, Gorman, Coffee, Thomson, Gilbert & Mudge, P.C., of Edwardsville, for appellant.

Matthew J. Padberg and James P. Leonard, both of Padberg, McSweeney, Slater & Merz, P.C., of St. Louis, Missouri, for appellee.

JUSTICE WELCH delivered the opinion of the court:

In the early morning of December 29, 1990, plaintiffs Brian Banovz and Joseph Seketa were involved in a multi-vehicle accident on Interstate 270 in Madison County. They were passengers in a car driven by defendant-appellant, Raymond Rantanen, whose vehicle collided with a tractor-trailer which had jackknifed and was blocking all three lanes of traffic. Both plaintiffs sustained serious injuries, and they filed suit against Rantanen and against the driver of the tractor-trailer, David Lynn Wittaker, and the owner of the tractor-trailer and Wittaker's employer, the Mickow Corporation, alleging negligence. Both codefendants filed counterclaims against each other seeking contribution. The case proceeded to trial on plaintiffs' complaints and the counterclaims, and the jury returned verdicts in favor of Banovz in the amount of $1,005,120, and in favor of Seketa in the amount of $817,769. The jury also found defendant Rantanen 40% at fault and defendants Mickow Corporation and Wittaker (hereinafter Mickow) 60% at fault. The circuit court of Madison County entered judgment on the verdicts on October 1, 1993.

Rantanen appeals the judgment in favor of Seketa only, having settled with Banovz. Rantanen raises numerous issues on appeal, which may be generally characterized as follows: (1) whether the settlement agreement entered into between Seketa and Mickow prior to trial, in which Mickow guaranteed a minimum recovery to Seketa, regardless of the verdict, in return for a maximum cap on its liability, was a *Mary Carter* agreement, which Rantanen should have been allowed to disclose to the jury; (2) whether the trial court erred in failing to dismiss the counterclaims for contribution in light of the good-faith settlement agreement between Seketa and Mickow; (3) whether the trial court erred in allowing evidence of Rantanen's alleged consumption of alcohol where that evidence related only to the counterclaims for contribution, violated Rantanen's physician-patient privilege, and was, in any event, insufficient to establish intoxication; and (4) whether the verdict in favor of Seketa and against Rantanen was against the manifest weight of the evidence, entitling Rantanen to a new trial on all issues.

We will turn first to the settlement agreement between Seketa and Mickow. On the first day of trial, September 7, 1993, Seketa and Mickow entered into a "Settlement Agreement" which provided that the minimum amount to be recovered by Joseph Seketa in the lawsuit would, in no event, be less than $150,000, even if the jury's verdict was less than that amount, and that, regardless of the size of the verdict against Mickow, the maximum amount that Mickow would be liable to Seketa for is $415,000, even should the jury verdict exceed that amount. The agreement further provided that Seketa could recover any additional amounts of a jury verdict, as he desired, against Rantanen. The agreement includes no other provisions, such as a requirement that Mickow stay in the lawsuit or that Mickow may recover any amount it pays out of any recovery Seketa receives from Rantanen. Banovz entered into an identical agreement with Mickow.

The trial court and Rantanen were advised of the settlement agreements prior to trial by Mickow, who pointed out that the maximum amount recoverable under the agreements with both Seketa and Banovz was just $50,000 less than the insurance policy limit in the case. Rantanen advised that it would be seeking to admit the agreements into evidence for the jury's consideration. Mickow and plaintiff then moved *in limine* to exclude any mention of the agreements before the jury, and the motion was allowed subject to reconsideration upon the submission of case law.

On September 10, 1993, Rantanen filed a motion asking the court to reconsider its ruling on the motion *in limine* and to allow Rantanen to use the agreement in cross-examination of defendant Wittaker to show bias. This motion was denied.

Rantanen argues on appeal that, because the settlement agreement was a form of *Mary Carter* agreement, the trial court abused its discretion in granting the motion *in limine* and refusing to allow the agreement to be disclosed to the jury and used in cross-examination. The first question presented to us, then, is whether the settlement agreement is, in fact, a *Mary Carter* agreement.

■ *Mary Carter* agreements, which derive their name from the Florida case, *Booth v. Mary Carter Paint Co.* (Fla. Dist. Ct. App. 1967), 202 So. 2d 8, occur in multi-party litigation when fewer than all defendants settle with the plaintiff. (*Carter v. Tom's Truck Repair, Inc.* (Mo. 1993), 857 S.W.2d 172, 175.) A *Mary Carter* agreement has the following features: (1) the liability of the settling defendant is limited and the plaintiff is guaranteed a minimum recovery; (2) the settling defendant remains a party to the pending action without disclosing the full agreement to the nonsettling defendants and/or the judge and jury; and (3) if judgment against the nonsettling defendant is for more than the amount of settlement, any money collected

will first offset the settlement so that the settling defendant may ultimately pay nothing. (*Carter*, 857 S.W.2d at 175.) It is this third feature which poses the real problem, for it gives the settling defendant a direct financial interest in the amount recovered against any nonsettling defendant. (*Carter*, 857 S.W.2d at 175.) When this financial interest is kept secret from the jury, it distorts the adversarial process and potentially undermines the right to a fair trial. *Carter*, 857 S.W.2d at 175-76.

For example, in *Carter*, the plaintiff, Carter, was rear-ended by a Consolidated Freightways truck driven by Johnny Bauer. The truck's brakes, which had allegedly failed, had recently been repaired by Tom's Truck Repair. Carter sued Consolidated, Bauer, and Tom's. Consolidated and Tom's cross-claimed against each other for apportionment. Before trial, Carter and Consolidated entered into a settlement agreement in which Consolidated agreed to pay Carter $250,000 regardless of the jury verdict, Consolidated would remain in the case as a defendant, and any judgment against Tom's, or settlement paid in favor of Carter, would reduce dollar for dollar Consolidated's settlement obligation. Thus, Consolidated's maximum total liability was $250,000, and if judgment against Tom's exceeded $250,000, Consolidated would pay nothing.

A *Mary Carter* agreement such as the one in *Carter* effectively realigns the parties and, because it is kept secret from the jury, distorts the adversarial process. "By painting a gruesome testimonial picture of the other defendant's misconduct or, in some cases, by admissions against himself and the other defendants, [a settling defendant] could diminish or eliminate his own liability by use of the secret '*Mary Carter* Agreement.' " (*Ward v. Ochoa* (Fla. 1973), 284 So. 2d 385, 387.) In *Carter*, the interests of plaintiff Carter and defendant Consolidated at trial were identical. Both parties sought a jury verdict that would exceed $250,000 and that would maximize Tom's liability or percentage of fault. In the event of such a verdict, Carter would collect more than the $250,000 guaranteed by Consolidated, yet Consolidated would pay nothing. Thus, Consolidated's status as a party-defendant was illusory, and Consolidated was effectively and practically realigned with plaintiff.

It is true, as pointed out in *Carter*, that codefendants in any lawsuit who have filed cross-claims against each other to apportion fault are usually mutually antagonistic, regardless of whether one is a party to a settlement agreement with plaintiff. However, both parties maintain an interest in minimizing the amount of damages and in a finding of no liability for all defendants. Furthermore, this antagonism is apparent to and explained to the jury. A *Mary Carter*

agreement, which realigns the interests of the codefendants *vis-a-vis* each other, is kept secret from the jury. The jury, if apprised of the agreement, would likely weigh differently the testimony and conduct of the settling defendant as related to the nonsettling defendant. *Ochoa*, 284 So. 2d at 387.

There are variations of the *Mary Carter* agreement, but they all give the settling defendant some interest in increasing the liability of the nonsettling defendant and a financial incentive to bolster the plaintiff's case. The agreements effect a change in the relationship of the codefendants and create a tremendous incentive for the settling defendant to ensure that the plaintiff succeeds in obtaining a sizable recovery, thus motivating the defendant to assist greatly in the plaintiff's presentation of the case. (*Elbaor v. Smith* (Tex. 1992), 845 S.W.2d 240, 247.) Accordingly, some courts have found the agreements to be void as against public policy (*Elbaor*, 845 S.W.2d at 250; *Lum v. Stinnett* (1971), 87 Nev. 402, 409, 488 P.2d 347, 351; *Trampe v. Wisconsin Telephone Co.* (1934), 214 Wis. 210, 212-18, 252 N.W. 675, 675-78; *Dosdourian v. Carsten* (Fla. 1993), 624 So. 2d 241, 246), while others have allowed them but have required that they be disclosed to the jury at trial. *Carter*, 857 S.W.2d at 177.

■ Few Illinois courts have addressed the issues relating to *Mary Carter* agreements. However, like those of other jurisdictions, Illinois courts have been concerned with the effect of these agreements on the integrity of the adversarial nature of the judicial process. (See *Schell v. Albrecht* (1978), 65 Ill. App. 3d 989, 992, 383 N.E.2d 15, 17-18.) These courts have stressed the importance of the opportunity to show a witness' bias arising as a result of the agreement. See *Schell*, 65 Ill. App. 3d at 992, 383 N.E.2d at 18.

> "In each instance, the courts have insisted that the adversary relationship between the parties must be preserved. Additionally, the opportunity to show a witness's bias arising as a result of the agreement is essential. Only if these twin concerns do not present themselves as a result of the agreement between plaintiff and defendant will the court be satisfied that the integrity of the judicial process is not jeopardized." (*Schell*, 65 Ill. App. 3d at 993, 383 N.E.2d at 18.)

Thus, our supreme court has repeatedly held that loan-receipt agreements in which the settling defendant is entitled to be repaid out of recovery from a nonsettling codefendant must be disclosed to the jury and the nonsettling defendant must be allowed to cross-examine witnesses as to the agreement to show bias. (*Reese v. Chicago, Burlington & Quincy R.R. Co.* (1973), 55 Ill. 2d 356, 364, 303 N.E.2d 382, 387; *Gatto v. Walgreen Drug Co.* (1975), 61 Ill. 2d 513, 522, 337 N.E.2d

23, 29.) Indeed, in *Kerns v. Engelke* (1979), 76 Ill. 2d 154, 169, 390 N.E.2d 859, 866, our supreme court quoted with approval from Michael, *"Mary Carter" Agreements in Illinois*, 64 Ill. B.J. 514, 521 (1976):

> "After *Gatto* and *Reese* it can now definitely be said that in Illinois if a 'Mary Carter' agreement [*i.e.*, a loan agreement] is entered into between any of the parties to a given lawsuit the agreement must be revealed and it can be used for purposes of impeachment and introduced into evidence for consideration by the jury with an instruction on the limited effect of its admission if requested."

We emphasize, however, that the type of loan agreement referred to by our supreme court in *Reese*, *Gatto*, and *Kerns* is one where the settling defendant is entitled to be repaid the loan from any amounts collected from a nonsettling defendant and therefore does contain the essential feature of a true *Mary Carter* agreement.

■ The settlement agreement in the case at bar does not contain this essential feature of a true *Mary Carter* agreement. The settlement agreement in the case at bar does not provide for the settling defendant to recover any sums from the nonsettling defendant in any event. It does not give the settling defendant any financial interest in the amount recovered from a nonsettling defendant, it does not give the settling defendant a financial incentive to bolster the plaintiff's case, and it does not effect a change in the relationship of the codefendants. While the two codefendants in this case, as in any case where cross-claims for contribution are pending, had adverse interests with respect to their respective liability, they both had an interest in minimizing plaintiff's damages. Any antagonism between the codefendants was a result of their respective cross-claims and not a result of the settlement agreement.

Thus, we conclude that the agreement here was not a true *Mary Carter* agreement. The question remains, however, whether the trial court erred in refusing to allow Rantanen to cross-examine defendant Wittaker about the agreement in order to show his bias.

In *Lewis v. Illinois Central R.R. Co.* (1992), 234 Ill. App. 3d 669, 683, 600 N.E.2d 504, 513, we held that, even where evidence of a settlement agreement might be admissible to prove a point like witness bias, the decision to admit or exclude the evidence rests within the discretion of the trial court. In *Lewis*, the party seeking to admit evidence of the settlement agreement argued, as plaintiff does here, that such evidence would have helped the jury to understand the true interests and alignment of the parties. We pointed out in *Lewis* that there was nothing about the parties' alignment which was not

already apparent from the first day of trial. Any bias or interest of the parties and witnesses was apparent to the jury even without knowledge of the settlement agreement. Thus, there was no abuse of discretion in refusing to allow evidence of the settlement agreement.

Similarly, in the case at bar, the interests and alignment of the parties was apparent from the first day of trial. The witness whom Rantanen sought to cross-examine regarding the settlement agreement was a codefendant (Wittaker) who had a counterclaim against Rantanen alleging that it was Rantanen's negligence which was the cause of plaintiff's injuries. As we have already pointed out, the agreement itself created no additional interest or bias on the part of defendant Wittaker that was adverse to defendant Rantanen. Thus, no additional bias of Wittaker would have been revealed by his cross-examination regarding the settlement agreement. That agreement gave Wittaker no interest in a verdict adverse to Rantanen other than that already existing by virtue of his counterclaim.

Our supreme court stated in *Casson v. Nash* (1978), 74 Ill. 2d 164, 169, 384 N.E.2d 365, 367:

> "[W]hen a witness whose interest in the outcome of the case is not apparent to the jury may be influenced by the existence of a loan-receipt agreement, the jury may properly consider the effect of the agreement on the credibility of that witness."

However, the court held that where the witness' interest is already apparent, there is no need for the jury to be informed about the loan-receipt agreement and, indeed, to expose the existence of the agreement to the jury is improper. *Casson*, 74 Ill. 2d at 169-70, 384 N.E.2d at 367.

While there are cases where the bias of a witness as a result of a settlement agreement might not be apparent to the jury without knowledge of that agreement (*Pierce v. Commonwealth Edison Co.* (1981), 101 Ill. App. 3d 272, 428 N.E.2d 174; *Lam v. Lynch Machinery Division of Lynch Corp.* (1988), 178 Ill. App. 3d 229, 533 N.E.2d 37), this is not such a case. Informing the jury of the settlement agreement between Seketa and Mickow would not have aided the jury in its truth-finding mission and indeed might have prejudiced the interests of all parties. The trial court did not abuse its discretion in granting the motion *in limine* to exclude evidence of the settlement agreement between Seketa and Mickow.

■ The next argument raised by Rantanen is that, after finding that the settlement agreement between Mickow and Seketa was made in good faith, the trial court erred in refusing to dismiss the two counterclaims for contribution between codefendants Mickow and Rantanen. The Joint Tortfeasor Contribution Act (740 ILCS 100/0.01

*et seq.* (West 1992)) (hereinafter Act) provides that when a release or covenant not to sue or covenant not to enforce judgment is given in good faith, all rights of contribution between the settling defendant and any other tortfeasor not a party to the settlement are extinguished. (740 ILCS 100/2 (West 1992).) Rantanen argues that the settlement agreement between Seketa and Mickow was a covenant not to enforce judgment, that on the fourth day of trial during the presentation of plaintiffs' case in chief the trial court made a finding that the settlement agreement was in good faith within the meaning of section 2 of the Act, and that the trial court erred in denying Rantanen's motion to dismiss the contribution counterclaims pursuant to section 2 of the Act. We agree.

■ It is true that the settlement agreement is not denominated by the parties thereto as a "covenant not to enforce judgment," and it certainly does not contain in its text an explicit promise by plaintiff not to take action to enforce a judgment. Indeed, the agreement appears to have been carefully drafted so as not to include language referring to plaintiff's right to enforce a judgment. Yet there can be little doubt that the agreement is, in fact and in effect, a covenant not to enforce judgment. The agreement provides:

"Joseph Seketa further agrees that regardless of the size of the verdict against The Mickow corporation and David Lynn Wittaker, the maximum amount that The Mickow Corporation and David Lynn Wittaker will be liable to Joseph Seketa for is Four Hundred Fifteen Thousand Dollars ($415,000.00), even should the jury verdict against The Mickow Corporation and David Lynn Wittaker exceed that amount."

The agreement clearly contains a promise that Seketa will not enforce a judgment against Mickow in an amount in excess of $415,000, in return for a promise that Mickow will, in any event, pay Seketa the greater of $150,000 or the actual amount of the judgment up to $415,000. We find that the settlement agreement in the case at bar is a covenant not to enforce judgment in an amount in excess of $415,000 and does fall within section 2 of the Act.

Furthermore, on September 10, 1993, the trial court made a finding that the settlement agreement was in good faith within the meaning of section 2 of the Act. In a discussion out of the presence of the jury, Mickow asked for a finding of good faith and represented to the court that its insurance policy limit was $880,000 and that the settlement agreements with Seketa and Banovz limited Mickow's exposure to $830,000, just $50,000 less than the policy limit. The court indicated that it knew of no reason the agreement was not in good faith, and no party offered any argument or evidence that the agree-

ment was not in good faith. Accordingly, the trial court indicated that it was orally finding that the agreement was in good faith and that if the parties wanted to draw up a written order to that effect, the court would sign it. No such written order was entered. However, despite finding that the settlement agreements were in good faith, the trial court denied Rantanen's motion to dismiss the counterclaims for contribution. In this, the trial court erred.

■ The Act is clear that where a covenant not to enforce judgment has been given in good faith, it extinguishes any rights of contribution between the settling tortfeasor and any other tortfeasor not included in that settlement. (*Pearson Brothers Co. v. Allen* (1985), 131 Ill. App. 3d 699, 476 N.E.2d 73.) Thus, upon finding that the covenant not to enforce judgment was given in good faith, the trial court should have dismissed the counterclaims for contribution pending between Mickow and Rantanen. The trial court erred in failing to do so.

It is interesting that while during trial Mickow opposed the dismissal of the contribution counterclaims, arguing that it might be entitled to contribution *from* Rantanen, after return of the verdict and entry of judgment, when it was clear that Mickow was not entitled to contribution from Rantanen but was liable for contribution *to* Rantanen, Mickow itself moved for dismissal of the contribution counterclaims, arguing that it had entered into a good-faith settlement agreement with plaintiff which extinguished any rights of contribution. It appears that defendant Mickow wanted to have its proverbial cake and to eat it too.

■ The error of the trial court in refusing to dismiss the contribution counterclaims prejudiced Rantanen and deprived him of a fair trial because it was only by virtue of these counterclaims that evidence of Rantanen's consumption of alcohol on the night of the accident was presented to the jury. In their complaints against Rantanen, neither plaintiff alleged that he had been under the influence of alcohol at the time of the accident. Only Mickow, in its counterclaim for contribution, alleged that Rantanen had been under the influence of alcohol at the time of the accident. Neither plaintiff offered any evidence of intoxication, and indeed plaintiffs argued to the jury that Rantanen was *not* intoxicated at the time of the accident. Mickow introduced evidence in an attempt to show that Rantanen was under the influence of alcohol at the time of the accident and argued vigorously to the jury that Rantanen was under the influence of alcohol at the time of the accident. Indeed, most of Mickow's closing argument to the jury was aimed at showing that the proximate cause of plaintiffs' injuries was not the jackknifed tractor-trailer but Rantanen's inability to avoid the accident because of his intoxication.

Evidence of the consumption of alcoholic beverages by the defendant/driver of an automobile involved in an accident, when improperly admitted, is highly prejudicial to the defendant/driver. (*Young v. Gateway Transportation Co.* (1975), 26 Ill. App. 3d 864, 873, 326 N.E.2d 222, 229.) When evidence of intoxication is not material to any issue in the case, it is improperly admitted.

Evidence must be material to be admissible. (*O'Brien v. Walker* (1977), 49 Ill. App. 3d 940, 951, 364 N.E.2d 533, 541; *Kniceley v. Migala* (1992), 237 Ill. App. 3d 72, 81, 603 N.E.2d 843, 849, *vacated & rem'd on other grounds* (1993), 149 Ill. 2d 650, 609 N.E.2d 1391.) Evidence is material when it is offered to prove a proposition which is in issue or is probative of a matter in issue. (*Yamnitz v. William J. Diestelhorst Co.* (1993), 251 Ill. App. 3d 244, 250, 621 N.E.2d 1046, 1050.) In the instant case, evidence of Rantanen's drinking was offered to prove the proposition that Rantanen was negligent in driving while under the influence of alcohol. However, this proposition was only in issue by virtue of the contribution counterclaims. In the absence of these counterclaims, evidence of Rantanen's consumption of alcohol on the night of the accident was simply not material.

Material evidence relates to an issue in the case, and the issues are defined by the pleadings. The issue of Rantanen's intoxication was raised only by Mickow's counterclaim for contribution, which should have been dismissed by the trial court. Thus, in this case, Rantanen's intoxication was not properly an issue, and evidence with respect thereto was not properly admitted. As we have stated, evidence relating to intoxication, when improperly admitted, is highly prejudicial. Because the counterclaims should have been dismissed, the issue of Rantanen's intoxication should not have been an issue in the case. Rantanen was seriously prejudiced by the admission of evidence of his consumption of alcohol on the night of the accident. Without this evidence, the jury may have apportioned liability between the two codefendants quite differently. Accordingly, this cause must be remanded for a new trial on the issue of liability.

While it is somewhat unusual to remand a cause for retrial on the issue of liability alone, Supreme Court Rule 366(a)(5) gives this court the power to order a partial new trial. (134 Ill. 2d R. 366(a)(5).) While this power is usually exercised to order a new trial on the issue of damages alone, we see no reason why, in this case, it cannot be exercised to order a partial new trial on the issue of liability. (See *Nanavati v. City of Chicago* (1971), 2 Ill. App. 3d 1, 4, 275 N.E.2d 707, 709.) The power has been so exercised in the past. In *Lundy v. Whiting Corp.* (1981), 93 Ill. App. 3d 244, 259, 417 N.E.2d 154, 167, after finding that the amount of damages awarded was not affected by the

trial court's error in failing to submit the issue of assumption of risk to the jury, this court remanded the case for a new trial on the issue of liability alone. Similarly, in the case at bar, we find that the award of damages is well supported by the evidence and was not affected by the trial court's error resulting in evidence of Rantanen's consumption of alcohol being presented to the jury.

On retrial, the issue of apportionment of fault pursuant to section 2—1117 of the Code of Civil Procedure (735 ILCS 5/2—1117 (West 1992)), between the plaintiff, Rantanen, and Mickow, may also be presented to the jury. In *Lannom v. Kosco* (1994), 158 Ill. 2d 535, 542-43, 634 N.E.2d 1097, our supreme court discussed the effect of a settlement agreement between one defendant and plaintiff on the apportionment of fault with respect to a remaining defendant. Our supreme court stated that such a settlement does not abolish the remaining defendant's right to apportionment under section 2—1117. The supreme court concluded that the jury may still assess the remaining defendant's relative culpability, and if the degree of fault attributable to that defendant is less than 25%, that defendant's liability is several only.

Rantanen also argues that the trial court erred in admitting evidence of his consumption of alcohol because it violated his physician-patient privilege and the evidence was insufficient to establish intoxication so as to allow the issue to go to the jury. In light of our remand of this case for a new trial without the contribution counterclaims in issue, we find it unnecessary to discuss this issue.

■ Finally, Rantanen argues that he is entitled to a new trial on all issues because the jury's verdict is against the manifest weight of the evidence. Rantanen specifically argues that any negligence on his part was not the proximate cause of plaintiff's injuries; that once the tractor-trailer jackknifed, the collision was unavoidable and it was the negligence of Mickow which was the proximate cause of the accident.

A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence. (*Maple v. Gustafson* (1992), 151 Ill. 2d 445, 454, 603 N.E.2d 508, 512-13.) We will not set forth all of the evidence presented at trial. Suffice it to say that we have carefully reviewed the report of proceedings and find that the jury's verdict is supported by the evidence. We note that the evidence shows that although two other vehicles collided with the tractor-trailer prior to Rantanen, the drivers of those vehicles were able to slow their vehicles sufficiently before impact so that no one was injured. The evidence indicates that

Rantanen made no attempt to slow his vehicle prior to impact or to otherwise avoid the accident. Even considered in the absence of evidence of Rantanen's consumption of alcoholic beverages, there is sufficient evidence to support the jury's verdict against him.

For the foregoing reasons, we affirm the amount of damages awarded, reverse the findings of liability and apportionment of fault, and remand this cause to the circuit court of Madison County for a new trial on the issues of liability and apportionment of fault.

Affirmed in part; reversed in part and remanded.

CHAPMAN and LEWIS, JJ., concur.