JEREMY SIMPSON, Plaintiff-Appellant, v. RUSSELL MATTHEWS, Defendant and Counterdefendant-Appellee (Alan Reynolds, Defendant and Counterplaintiff-Appellee).

Fifth District   No. 5—00—0754

Opinion filed May 5, 2003.

324

Stephen W. Stone, of Howerton, Dorris, Stone & Phelps, of Marion, for appellant.

Daniel R. Price, of Wham & Wham, of Centralia, for appellee Russell Matthews.

Jerome E. McDonald, of Campbell, Black, Carnine, Hedin, Ballard & McDonald, P.C., of Mt. Vernon, for appellee Alan Reynolds.

JUSTICE CHAPMAN delivered the opinion of the court:

This action was brought by a car's passenger, Jeremy Simpson, against the car's driver, Alan Reynolds, and another vehicle's driver, Russell Matthews, to recover damages for personal injuries resulting from a two-vehicle accident. Prior to the trial, Simpson entered into an agreement with Reynolds that he would not seek a recovery beyond Reynolds' insurance policy limits, in exchange for his remaining a party to the suit. Matthews filed a motion to dismiss Simpson's complaint against Reynolds and Reynolds' counterclaim against Matthews, contending that as a result of the agreement, no justiciable matter existed between Simpson and Reynolds. The court dismissed both the claim against Reynolds and the counterclaim against Matthews and made the express finding that there was no just reason for delaying the appeal. Simpson takes this appeal pursuant to Illinois Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)).

We hold that the agreement was not void as contrary to public policy and left a justiciable controversy between Simpson and Reynolds. We reverse and remand.

## I. BACKGROUND

The plaintiff, Jeremy Simpson, was a passenger in a car driven by Alan Reynolds. Reynolds' car was struck by a truck driven by Russell Matthews. Simpson suffered serious head injuries as a result of the accident, incurring more than $150,000 in medical bills. Simpson brought suit against both drivers. Reynolds sought contribution from

Matthews. Discovery revealed that Reynolds was insured for $50,000, while Matthews was insured for $1 million. Reynolds orally tendered the $50,000 policy limits in full settlement of the claim against him. This offer was rejected by Simpson, and a subsequent agreement was entered into between Simpson and Reynolds, memorialized by letters dated October 20 and 25, 1999:

"October 20, 1999

\* \* \*

I want to write you this letter to confirm our informal discussion of October 20th just prior to the discovery depositions of Dr. Meinert and Mr. Williamson in Carbondale, Illinois. Based on that conversation, it is my understanding that, while you are not formally accepting the settlement offer of my client's policy limits less the medical pay, you have agreed to accept that amount of money in full compensation of any settlement or judgment that might be rendered against my client, Alan Reynolds. It is my further understanding that you want to keep Mr. Reynolds in this case so that the co[ ]defendant, Russell Matthews, will not have an empty chair to point to. In return for that assurance, I will be less active in the defense of this case, particularly the medical issues, and still active in my pursuit of Russell Matthews as the sole or at least primary tortfeasor in connection with this case. Please provide me with some type of written acknowledgment along these lines so I will not feel compelled to become active at the upcoming health care evidence depositions that you have scheduled in this case. Thank you.

Very truly yours,

\*\*\*

BY Roy L. Carnine"

"October 25, 1999

\* \* \*

Your October 20, 1999[,] letter fairly sets out our conversation. However, I want to be clear that in the Simpsons' [sic] interest, although we will not pursue Mr. Reynolds personally for damages, no 'settlement' has been accepted. Please call if you have questions.

Yours truly,

Patricia Littleton

\*\*\*

cc: Daniel R. Price" (Emphasis in original.)

Having been made aware of this agreement shortly after its inception, Matthews' counsel filed a motion to dismiss Simpson's complaint against Reynolds, pursuant to section 2—619 of the Code of Civil

Procedure (735 ILCS 5/2—619 (West 2000)), and a motion to dismiss Reynolds' counterclaim for contribution against Matthews, contending that the agreement left no justiciable controversy between the two parties. The court granted Matthews' motion. Simpson appeals.

Simpson argues on appeal both that the agreement is not a settlement and that the agreement is not against public policy.

## II. ANALYSIS

While appellant Simpson and appellee Reynolds take pains to distinguish this agreement from a settlement agreement, we must look beyond labels to consider the legal effect of the agreement. In addressing a similar query, the Pennsylvania Supreme Court eloquently opined: "This Agreement, when viewed in its entirety, can hardly be described as a conclusive resolution or final disposition of the disputed matters between the plaintiffs and the original defendants. Rather, it is merely the first act in a two-act play, and matters between them will not be conclusively resolved or finally disposed until the final curtain has come down." *Hatfield v. Continental Imports, Inc.*, 530 Pa. 551, 562, 610 A.2d 446, 451 (1992). There can be no question but that the agreement's purpose was to effect the settlement of some issues before the court, albeit conditional upon the outcome of the trial. Whether we call this an agreement or a settlement (as do the majority of the courts), the important questions are whether the agreement's effect controverts the integrity of the judicial process and whether the court was left with any justiciable issues.

■ We review *de novo* the court's granting of a section 2—619 motion to dismiss. *Johnson v. Du Page Airport Authority*, 268 Ill. App. 3d 409, 414, 644 N.E.2d 802, 805 (1994).

## Mary Carter Agreements

■ Illinois courts, as do the courts of many other jurisdictions, approve of a number of types of trial settlements in multiparty litigation. If the settlement does not distort the adversarial process, the courts generally support these settlements as a matter of a public policy favoring settlement. See P. Shockley, *The Use of Mary Carter Agreements in Illinois*, 18 S. Ill. U. L.J. 223, 241 (1993). A "Mary Carter agreement" is one kind of a trial settlement in multiparty litigation, in which fewer than all defendants settle. The term derives from a Florida case, *Booth v. Mary Carter Paint Co.*, 202 So. 2d 8 (Fla. App. 1967). In *Booth*, the husband of a woman killed in an automobile accident filed suit against four defendants. A settlement agreement reached with two of the defendants provided that the two settling defendants would not be liable above $12,500 and that if the verdict exceeded $37,500, the two settling defendants would owe nothing. The

agreement also stipulated that both settling defendants would remain in the case and that the agreement would remain secret from the court and the other defendants. The agreement was upheld on appeal. *Booth*, 202 So. 2d 8.

While all jurisdictions have concerns about how these types of agreements affect the adversarial process, only a few jurisdictions outright prohibit Mary Carter agreements, including Texas (*Elbaor v. Smith*, 845 S.W.2d 240 (Tex. 1992)), Florida (*Dosdourian v. Carsten*, 624 So. 2d 241 (Fla. 1993)), Nevada (*Lum v. Stinnett*, 87 Nev. 402, 488 P.2d 347 (1971)), Wisconsin (*Trampe v. Wisconsin Telephone Co.*, 214 Wis. 210, 252 N.W. 675 (1934)), and Oklahoma (*Cox v. Kelsey-Hayes Co.*, 594 P.2d 354 (Okla. 1978)).

Other jurisdictions allow Mary Carter agreements but place safeguards on their use, thereby balancing the public policy promoting settlements with the potential for a distortion of the adversarial process. See *City of Tucson v. Gallagher*, 108 Ariz. 140, 493 P.2d 1197 (1972) (the Arizona Supreme Court upheld the use of Mary Carter-type agreements, called "*Gallagher* agreements"); *Carter v. Tom's Truck Repair, Inc.*, 857 S.W.2d 172 (Mo. 1993) (the Missouri Supreme Court upheld a Mary Carter agreement, finding that a limited disclosure of the agreement could prevent prejudice to the nonsettling parties); *Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin*, 828 P.2d 745 (Alaska 1992) (the Alaska Supreme Court upheld the use of Mary Carter-type agreements, called "loan-receipt agreements," finding that the disclosure of the realignment of interests as a result of the settlement allowed the jury to evaluate the credibility of witnesses); *Hatfield v. Continental Imports, Inc.*, 530 Pa. 551, 610 A.2d 446 (1992) (the Pennsylvania Supreme Court upheld a Mary Carter agreement, holding that the jury must be advised of the settlement to the extent that a potential for bias exists); *Ratterree v. Bartlett*, 238 Kan. 11, 707 P.2d 1063 (1985) (the Kansas Supreme Court adopted a rule that allowed Mary Carter agreements and other settlement agreements between a plaintiff and one or more but not all the defendants, if disclosed to the court and the nonsettling parties and with limited disclosure to the jury, called "the *Ratterree* rule").

Illinois also has shown concern in preserving the adversarial relationship between the parties when faced with Mary Carter-type settlements. The first Illinois Supreme Court case to address this concern—*Reese v. Chicago, Burlington & Quincy R.R. Co.*, 55 Ill. 2d 356, 303 N.E.2d 382 (1973)—was a wrongful-death case involving a loan-receipt agreement with one of the two defendants. The plaintiff received a loan from the settling defendant, which was to be repaid from any amounts collected from the nonsettling defendant. The court

upheld the validity of the agreement, concluding that any undermining of the adversarial nature and integrity of the proceedings could be corrected by permitting the cross-examination of witnesses regarding their knowledge of the agreement and thereby exposing any resulting bias. *Reese*, 55 Ill. 2d at 364, 303 N.E.2d at 387.

For some time, Illinois continued to tolerate Mary Carter agreements by requiring additional safeguards. See *Gatto v. Walgreen Drug Co.*, 61 Ill. 2d 513, 337 N.E.2d 23 (1975) (the requirement for the disclosure of the agreement was absolute); see also *Kerns v. Engelke*, 76 Ill. 2d 154, 170, 390 N.E.2d 859, 867 (1979) (the agreement must be entered into before a judgment is reached). However, the Illinois Supreme Court decided in *In re Guardianship of Babb*, 162 Ill. 2d 153, 642 N.E.2d 1195 (1994), that it would no longer tolerate such settlements. *In re Guardianship of Babb* involved a loan-receipt agreement in which the plaintiff was to receive $400,000 from the settling defendant. The agreement, however, further provided that if the plaintiff successfully pursued a claim against a third party, he would pay back to the settling defendant $350,000, keeping only $50,000. The court concluded that loan-receipt agreements are not good-faith settlements because they violate the Joint Tortfeasor Contribution Act (740 ILCS 100/2 (West 2000)), by allowing the settling defendant to indirectly receive money from the nonsettling defendant. *In re Guardianship of Babb*, 162 Ill. 2d at 172, 642 N.E.2d at 1204. The danger the courts have seen in Mary Carter agreements is clear: they give one defendant a motive to help the plaintiff obtain a judgment against another defendant that is larger than the plaintiff might otherwise have obtained.

■ Here, Simpson argues that the agreement contains none of the elements of a Mary Carter agreement, while Matthews maintains that it is akin to a Mary Carter agreement because it distorts the adversarial process.

The elements of a Mary Carter agreement, as stated by this court, are:

> "(1) the liability of the settling defendant is limited and the plaintiff is guaranteed a minimum recovery; (2) the settling defendant remains a party to the pending action without disclosing the full agreement to the nonsettling defendants and/or the judge and jury; and (3) if judgment against the nonsettling defendant is for more than the amount of settlement, any money collected will first offset the settlement so that the settling defendant may ultimately pay nothing." *Banovz v. Rantanen*, 271 Ill. App. 3d 910, 913-14, 649 N.E.2d 977, 980-81 (1995).

While there are a variety of names for Mary Carter-type agreements,

as well as variations in terms, this court went on to state as follows: "[T]hey all give the settling defendant some interest in increasing the liability of the nonsettling defendant and a financial incentive to bolster the plaintiff's case. The agreements effect a change in the relationship of the codefendants and create a tremendous incentive for the settling defendant to ensure that the plaintiff succeeds in obtaining a sizable recovery, thus motivating the defendant to assist greatly in the plaintiff's presentation of the case." *Banovz*, 271 Ill. App. 3d at 915, 649 N.E.2d at 981.

■ This incentive for the settling defendant to help the plaintiff, which is often quoted as the essential element of Mary Carter agreements, is not present in the agreement in question. Additionally, the plaintiff never attempted to keep the agreement secret from the nonsettling defendant or the court, nor was there any guaranteed minimum recovery to the plaintiff. *Cf. Banovz*, 271 Ill. App. 3d at 913-14, 649 N.E.2d at 980-81. Consequently, we find that the agreement here was not a Mary Carter-type agreement.

## Joint Tortfeasor Contribution Act

■ Simpson and Reynolds next argue that the agreement does not affect contribution between the tortfeasors. Matthews counters that the agreement circumvents the Joint Tortfeasor Contribution Act (Contribution Act) (740 ILCS 100/0.01 *et seq.* (West 2000)) because it motivates the settling parties to attempt to increase both his liability percentage and the judgment against him. We disagree with both arguments.

Despite Simpson's and Reynolds' adamancy that the agreement does not constitute a settlement, it clearly contains a promise that Simpson will not enforce a judgment against Reynolds in an amount in excess of $50,000—"you have agreed to accept that amount of money [policy limits] in full compensation of any settlement or judgment that might be rendered against my client, Alan Reynolds." We find that the language of the agreement leaves little doubt that the agreement is a covenant not to enforce a judgment, thereby falling within section 2 of the Contribution Act (740 ILCS 100/2 (West 2000)). The Contribution Act provides that all rights of contribution between settling and nonsettling tortfeasors is extinguished when a release or covenant not to sue or to enforce a judgment is given in good faith. 740 ILCS 100/2 (West 2000). Consequently, neither party would have a claim for contribution following a finding of a good-faith settlement. See *Banovz*, 271 Ill. App. 3d at 919, 649 N.E.2d at 984.

Additionally, we do not find that the agreement violates the terms of the Contribution Act. Unlike the agreement in *In re Guardianship*

*of Babb,* the instant agreement does not circumvent the Contribution Act by benefiting the settling defendant monetarily at the expense of the nonsettling defendant. *In re Guardianship of Babb,* 162 Ill. 2d at 172, 642 N.E.2d at 1204. Nor does the agreement deprive the nonsettling defendant of his statutory right to a setoff. *Cf. In re Guardianship of Babb,* 162 Ill. 2d at 172-73, 642 N.E.2d at 1204. Under the agreement, Reynolds merely is responsible for paying to Simpson any judgment entered against him, up to $50,000, the amount of his insurance policy limits. He also receives the resulting benefit of extinguishing any contribution claim against him. Matthews has no legal basis to complain of this benefit. "It is not a lack of good faith for a defendant to settle with the plaintiff even though one purpose may be to purchase protection against a claim for contribution." *McDermott v. Metropolitan Sanitary District,* 240 Ill. App. 3d 1, 47, 607 N.E.2d 1271, 1299 (1992).

## Other Public Policy Concerns

Having decided that the agreement is not a Mary Carter agreement and does not violate the Contribution Act, we still must decide whether the agreement leaves justiciable issues before the court. Simpson contends that this agreement does not dispose of any of the justiciable issues, amounting to good lawyering. Matthews argues that the agreement realigns the parties and deprives him of a fair trial, amounting to a sham. After examining the agreement and the facts of the case, we are not impressed with Matthews' complaints.

Matthews relies solely on *Schell v. Albrecht,* 65 Ill. App. 3d 989, 383 N.E.2d 15 (1978), in support of his contention that this agreement deprived him of a fair trial, warranting the dismissal of Reynolds. The plaintiff in *Schell* was injured in a two-car collision. The plaintiff sued the driver of the car in which she was a passenger and both the driver and the owner of the other automobile involved in the accident. During the trial, the plaintiff entered into an oral secret agreement with two of the three defendants. The agreement provided as follows: (1) for $2,500, the plaintiff would not enforce any judgment against the settling defendants as long as a judgment was also rendered against the nonsettling defendant, and (2) the settling defendants would pay the $2,500 regardless of whether all of the defendants were found not liable, but (3) if a verdict was returned against one or both of the settling defendants and not the nonsettling defendant, the agreement would be null. *Schell,* 65 Ill. App. 3d at 991, 383 N.E.2d at 17. A verdict was returned for $40,000 against all the defendants and against one of the settling defendants on the nonsettling defendant's cross-claim. *Schell,* 65 Ill. App. 3d at 991, 383 N.E.2d at 17. When the nonsettling

defendant found out about the agreement, he moved for a new trial, as did the settling defendant on the cross-claim verdict. The court granted both motions because of the secret nature of the agreement. *Schell*, 65 Ill. App. 3d at 991, 383 N.E.2d at 17.

The appellate court affirmed a new trial on the plaintiff's complaint against all three defendants, but it denied a new trial for the settling defendant's cross-claim. The court found that the agreement left no justiciable issue before the court because the settling defendants were obligated to pay an amount of money regardless of whether they were found liable. The court further found that the nonsettling defendant was prejudiced by the secrecy of the agreement, and the court emphasized a party's right to be aware of the potential for witness bias resulting from the agreement. The court stated: "We do not quarrel with the contention that trial tactics do not ordinarily present the basis for a new trial. However, if the motive for the tactical decision stems from a *sub rosa* agreement, then all parties must be apprised of the understanding to allow them to evaluate the understanding's effect on the credibility of witnesses." *Schell*, 65 Ill. App. 3d at 994, 383 N.E.2d at 19.

The factual distinctions between *Schell* and the instant case cannot be overlooked, and they render *Schell* of little value in deciding this case. First, the *Schell* agreement was secret, unlike the Simpson agreement, which gave the nonsettling defendant the opportunity to show any witness bias. Second, the *Schell* agreement was for a sum certain that was to be paid to the plaintiff regardless of whether the settling defendants were found liable, unlike the Simpson agreement, which left liability and damages in controversy but limited recovery against the settling defendant for any verdict greater than $50,000. Third, the *Schell* court's remedy was a new trial, unlike the instant case where the remedy was a dismissal.

It is also helpful to look at the factual background of the instant case to better understand the motives of both Reynolds and Simpson regarding the agreement. Given the facts of this case—*i.e.*, the plaintiff was a passenger in a car driven by one defendant when that car collided with a car driven by another defendant, which caused the plaintiff serious injuries (medical bills greater than $150,000)—one cannot ignore the likelihood that one or both of the defendants would be found liable, and for a substantial amount of money. Reynolds' counsel's motive to offer Simpson the policy limits was twofold: (1) to protect the insured from a potential verdict above the policy limits and (2) to protect the insurer from a bad-faith claim in a case with the potential for a large verdict and little likelihood of being lost by the plaintiff. Simpson's counsel's explicit motive for refusing the policy

tender was to avoid the defense trial strategy known as the "empty chair." The "empty chair" strategy is well known to trial lawyers as a defendant's dream and a plaintiff's nightmare—since it allows the defendant to point the finger at an empty chair, where the settled defendant figuratively sits, and to argue that the settling defendant was the sole proximate cause of the injury (in essence, arguing that the plaintiff sued the wrong party). There is nothing inherently improper in the use of this strategy, nor is there anything improper in the attempt to avoid the strategy.

Matthews contends that the agreement implies that Reynolds would not defend himself and would become a "member of plaintiff's camp," departing from the "expected role of a fellow[ ]defendant." It is axiomatic that good lawyering involves maximizing a party's claim within the bounds of ethics and fair play. However, the right to a fair trial does not mean an ideal trial or a trial under circumstances most advantageous to either party. In a case such as this one, the realistic focus for both defendants is not as much on defeating the claim (which they have little likelihood of accomplishing) but, rather, on attempting to place the blame on each other. Reynolds acknowledges as much when he agrees to ''be less active in the defense of this case, particularly the medical issues, and still active in my pursuit of Russell Matthews as the sole or at least primary tortfeasor in connection with this case.''

In this context, Matthews' claim that he has been deprived of an expected unified defense holds little water. Here, the antagonistic relationship of the two defendants was already established when Reynolds counterclaimed against Matthews for contribution. See *Tom's Truck Repair, Inc.*, 857 S.W.2d at 177. And even if that were not the case, the expectation of a unified defense does not mean an entitlement to one. In *Gallagher*, a similar claim was made—that an agreement motivating the settling defendant to limit its questions on direct examination and to forego a cross-examination of the plaintiff and two of the plaintiff's medical witnesses deprived the nonsettling defendant of the right to a fair trial. The claim prompted the Arizona Supreme Court to respond that it knew "of no rule of law requiring cross-examination" and to add that nothing prevented the nonsettling defendant from cross-examining at length. *Gallagher*, 108 Ariz. at 143, 493 P.2d at 1200.

■ In the instant case, nothing has deprived Matthews of the ability to mount a vigorous defense through the direct examination or the cross-examination of witnesses. And despite the agreement, Reynolds still maintains an interest in minimizing any finding of liability, so as to reduce the potential for damages against him from a maximum of

$50,000 to zero. And while Reynolds maintains an interest in placing blame on Matthews for causing the accident, he has no additional incentive to increase the amount of any verdict against Matthews, because that would not decrease the amount of any money he may owe to Simpson. Both defendants still have an interest in minimizing the amount of damages and a finding of no liability. In sum, we do not believe that the agreement gave Reynolds an interest in a verdict adverse to Matthews other than the interest that already existed. Accordingly, we believe that all issues in controversy remain before the court.

## Disclosure to Jury

■ Finally, we believe that any potential for bias that may arise during the trial can be effectively dealt with by the trial judge through the disclosure of the agreement. Because we find that this is not a Mary Carter agreement, the issue of disclosure does not revolve around that status. While this court in *Banovz* held that a disclosure was not required when the agreement in question was determined not to be a Mary Carter agreement (*Banovz*, 271 Ill. App. 3d 910, 649 N.E.2d 977), we do not find that *Banovz* would preclude the disclosure of the terms of an agreement in a case such as this. The often-quoted phrase from a Missouri Supreme Court case upholding a Mary Carter agreement—"the surest cure for the ill effects of a Mary Carter agreement is disclosure of its terms to the court and to the jury" (*Tom's Truck Repair, Inc.*, 857 S.W.2d at 178)—reflects the courts' policy to encourage settlements while at the same time protect the nonsettling litigant's right to a fair trial. Kansas applies the disclosure remedy to all settlement agreements reached between one or more but not all the defendants (called "the *Ratterree* rule"). *Bartlett*, 238 Kan. 11, 707 P.2d 1063.

We note here that Simpson urges the disclosure of the agreement to the jury and that Matthews opposes a disclosure. While Matthews acknowledges that a cure for what he contends is a realignment of the parties would be a disclosure, he does not like the medicine offered, claiming that a disclosure would interject the issue of insurance into the case, thereby compounding the prejudice. We find Matthews' argument to be without merit.

The trial court can adequately safeguard Matthews' interest when it determines how to advise the jury that the potential for bias exists. The Pennsylvania Supreme Court, when faced with this issue in a case involving a Mary Carter agreement, stated: "This is not to say that agreements such as these should be admitted into evidence *in toto*. The court, as with all proffered evidence, should review the agree-

ment, balance the relevancy of it against the potential prejudice, and, exercising judicial discretion, admit or exclude as much as it deems appropriate. However, where an agreement clearly allies two or more parties against another, such that a clear potential for bias exists which would not otherwise be apparent to the factfinder, that part of the agreement, or at least the existence of the reason for the potential bias, must be conveyed to the factfinder." *Hatfield*, 530 Pa. at 563, 610 A.2d at 452. Here, there would be no reason to advise the jury regarding the issue of insurance. The Missouri Supreme Court in *Tom's Truck Repair, Inc.*, cautioned that the disclosure of the terms of these types of agreements should be limited to exclude prejudicial information such as the amounts of settlement and insurance. *Tom's Truck Repair, Inc.*, 857 S.W.2d at 178.

The trial court is clearly in the best position to make the determination regarding the need to disclose the terms of the instant agreement. See *Doty v. Bishara*, 123 Idaho 329, 335, 848 P.2d 387, 393 (1992). If such a disclosure becomes necessary, the court can then tailor the disclosure to avoid the mention of prejudicial material and at the same time allow the jury to form its own opinion about any effect the agreement may have on the credibility of the witnesses.

## III. CONCLUSION

For the foregoing reasons, we reverse the circuit court's order of dismissal and remand the cause for further proceedings.

Reversed; cause remanded.

WELCH and DONOVAN, JJ., concur.